Theresa Rassas, 023416
Joseph Roth, 025725
Osborn Maledon. P.A.
2929 North Central Ave., Suite 2000
Phoenix, AZ 85012
Tel: 602-640-9000
Email: trassas@omlaw.com
Email: jroth@omlaw.com

Brent P. Ray (Pro Hac Vice Forthcoming)
Arnold & Porter Kaye Scholer LLP
811 Main St., Suite 1800
Houston, TX 77002
Tel: 312-583-2325
Email: Brent.Ray@arnoldporter.com
Attorneys For Plaintiff, Honeywell Aerospace US LLC

(Additional Attorneys Identified in Signature Block)

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Honeywell Aerospace US LLC,<br>Plaintiff,<br>v.<br>Rivian Automotive, LLC and Rivian Automotive, Inc.,<br>Defendants. | Case No.<br>**COMPLAINT FOR PATENT INFRINGEMENT**<br>**JURY TRIAL DEMANDED** |

This case concerns Rivian's willful and unlicensed use of inventions that Honeywell Aerospace and its predecessor developed long ago to solve exceptionally difficult problems the automotive industry has only recently confronted: how a vehicle perceives the world around it, tells its operator what it detects, provides early warning of hazards to the operator, and reports its own faults for repair. Honeywell Aerospace pioneered these technologies years ago for aircraft. Rivian now sells vehicles that use these same critical inventions without permission.

Honeywell Aerospace is one of the largest independent aerospace and defense suppliers in the world. It employs more than 36,000 people globally, operates more than 90 engineering, manufacturing, and maintenance facilities, and serves thousands of customers. Its systems and technologies are found on commercial air transport, business aviation, defense, and space platforms, and its parts are incorporated in a significant majority of the aircraft currently in service worldwide.

Honeywell Aerospace's engineering heritage begins with the invention of the world's first autopilot. On June 18, 1914, Lawrence Sperry[1] demonstrated a gyroscopic aircraft stabilizer by climbing out onto the wing of his aircraft with no one at the controls. Honeywell Aerospace's technologies have been on essentially every major platform of powered flight since.

Over the century that followed, Honeywell Aerospace and its predecessor companies introduced a series of category-defining systems, including the first commercial auxiliary power units in the 1950s, the Ground Proximity Warning System in the 1970s, the first integrated digital cockpits in the 1990s, the Runway Awareness and Advisory System (RAAS) and combined power and thermal management systems in the 2000s, and electromechanical control actuation in the 2010s.

Honeywell Aerospace's engineers did not confine their work to aircraft platforms. For decades, Honeywell Aerospace engineers developed technologies applicable to numerous fields, including perception and navigation systems for autonomous[2] and unmanned ground vehicles: land vehicles that had to detect the road surface, identify lane markings, distinguish traversable ground from obstacles, and control speed and steering in all types of road conditions.

---

[1] The Sperry company, founded by Elmer and Lawrence Sperry, eventually became part of Honeywell through mergers and acquisitions.

[2] Autonomous vehicles are typically categorized by level, from Level 1 (driver assistance) all the way to Level 5 (full automation).

Honeywell Aerospace's sustained record of innovation resulted in more than 9,500 active patent assets filed in approximately 30 countries. The inventions asserted in this Complaint come from that body of work.

Rivian has been on notice of Honeywell Aerospace's patents, including those asserted in this case, for years. But Rivian decided to ignore Honeywell Aerospace's patent rights. Honeywell Aerospace therefore has no choice but to seek relief in this Court to address Rivian's willful patent infringement.

Plaintiff Honeywell Aerospace US LLC ("Honeywell Aerospace" or "Plaintiff"), by and through its undersigned counsel, files this Complaint for patent infringement against Defendants Rivian Automotive, LLC and Rivian Automotive, Inc. (collectively "Rivian" or "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for infringement of United States Patent Nos. 7,088,264, 7,286,062, 7,840,352, 8,314,816, 8,364,334, 9,355,567 and 10,133,856 (collectively, the "Patents-in-Suit") under the Patent Laws of the United States, 35 U.S.C. § 271, *et seq*.

## THE PARTIES

2. Plaintiff Honeywell Aerospace is a Delaware limited liability company with its principal place of business at 1944 E. Sky Harbor Circle North, Phoenix, Arizona 85034. For purposes of this complaint, Honeywell Aerospace used herein also includes the actions of its predecessors.

3. On information and belief, Defendant Rivian Automotive, Inc. is a Delaware corporation and is the public parent of Rivian Automotive, LLC.

4. On information and belief, Defendant Rivian Automotive, LLC is a Delaware limited liability company and a subsidiary of Rivian Automotive, Inc. On information and belief, Rivian Automotive, LLC is registered and active in Arizona as Arizona Entity No. 1931700 and has made, used, offered to sell, sold, and/or imported the accused Rivian vehicles in and into the United States, including Arizona and this District.

5. Defendants may be served through their registered agent for service in Delaware, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

6. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7. This Court has personal jurisdiction over Rivian because Rivian has had sufficient minimum contacts with Arizona such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. In particular, Rivian has committed acts of infringement in violation of 35 U.S.C. § 271 in the State of Arizona and has placed Infringing Products, as described below, into the stream of commerce, through an established distribution channel, with the knowledge and/or understanding that such products will be used and sold in this District. These acts caused and continue to cause injury to Honeywell Aerospace within this District, and Rivian derives substantial revenue from interstate and international commerce and expects or should reasonably expect its actions to have consequences within this District.

8. Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

9. Rivian has committed acts of infringement in this District by making, using, offering for sale, selling, and/or importing products or services that infringe the Patents-in-Suit, or by inducing others to infringe the Patents-in-Suit. Rivian has regular and established places of business in this District. By way of example, Rivian has showrooms and stores in this District and offers for sale infringing vehicles at numerous locations in this District, including at its showroom at 15051 North Kierland Boulevard, Suite 180F1B, Scottsdale, AZ 85254 and its service and demo center at 7340 South Kyrene Road, Suite 111, Tempe, AZ 85283.

10. Rivian Automotive, LLC is registered to do business in Arizona as an active foreign limited liability company (Arizona Entity No. 1931700). Rivian maintains its principal address at 30700 W. Patton Road, Wittmann, Arizona 85361.

11. Rivian performs its engineering, research and development, design, customer engagement, sales, services, and administrative activities in this District. For example, on information and belief, Rivian conducts recurring vehicle-testing and validation work in Wittmann, including through Rivian personnel assigned to vehicle testing and autonomy-systems validation.

12. This District is a meaningful locus of the inventive activity and technical work associated with the Patents-in-Suit. U.S. Patent No. 10,133,856 identifies inventors John McGregor and Scott Redmond as located in Phoenix, Arizona. U.S. Patent No. 7,286,062 identifies inventors Aaron J. Gannon, David A. Shirley, and Blake W. Wilson as located in Anthem, Goodyear, and Peoria, Arizona, respectively.

13. Moreover, Honeywell Aerospace is headquartered in Phoenix, employs more than 7,000 people in Arizona, and maintains at least eleven facilities in Arizona. Arizona therefore has a substantial local interest in resolving this dispute involving Honeywell Aerospace and its patented technologies, and this District is a convenient forum for relevant Honeywell Aerospace witnesses and evidence.

## OVERVIEW OF THE PATENTED INVENTIONS

### U.S. Patent No. 7,088,264

14. On August 8, 2006, U.S. Patent No. 7,088,264 ("the '264 Patent"), entitled "Flight Safety System Monitoring Combinations of State Values," was duly and legally issued by the USPTO. A true and accurate copy of the '264 Patent is attached hereto as Exhibit A.

15. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '264 Patent, including the sole and exclusive right to prosecute this action and enforce the '264 Patent against infringers, and to collect damages for all relevant times.

16. Independent claim 1 of the ’264 Patent recites a method comprising “monitoring values of states of the vehicle; comparing combinations of such values of states to known unsafe combinations; and identifying combinations of values of states of the vehicle that correspond to the unsafe combinations.” ’264 Patent, claim 1. Independent claim 24 recites a computer readable medium containing instructions for causing a computer to implement substantially the same method. *Id.*, claim 24.

17. The ’264 Patent states that although described embodiments are specific to flight safety systems, its methods and systems are not limited to any particular type of vehicle, describing a system that monitors states of “a vehicle such as an aircraft or other vehicle such as a spacecraft, or land-based vehicle.” *Id.*, 2:35-37.

18. As of March 14, 2002, conventional vehicle fault-detection systems evaluated sensor data one variable, or one sensor, at a time. A fault-detection system built on that architecture could identify a condition only if some individual sensor reading, considered alone, exceeded a defined threshold. Such a system could not identify a fault reflected only in a particular combination of readings across multiple sensors and commands, none of which was individually anomalous. *See id.*, 4:3-19.

19. The ’264 Patent addresses that deficiency by monitoring combinations of state values—which may include both sensed physical conditions and commands pending or being implemented by onboard computers or other devices—against a database of pre-identified combinations known to be unsafe or undesirable, and identifying when a vehicle’s current combination of states matches one of those known-unsafe combinations. The identification the claimed method performs is not a property of any individual monitored value; it exists only at the level of the combination, because the combination itself is what the system compares against the stored dataset. *See id.*, 3:10-4:26.

20. Claims 1 and 24 require this comparison to be performed continuously, in real time, across combinations of numerous sensed and commanded vehicle states, throughout ongoing vehicle operation. This is a task that a single-variable, threshold-based fault-detection architecture was not designed to perform—and could not perform—because such

an architecture has no mechanism for evaluating a combination of values against a stored set of known-unsafe combinations.

21. The claims of the ’264 Patent are not directed to a result achievable by unaided human observation. The claimed comparison—evaluating combinations of numerous sensed and commanded vehicle states against a stored dataset of known-unsafe combinations, continuously and in real time—has no counterpart in single-variable evaluation at any speed. An architecture that evaluates each sensed value against its own threshold does not reach the claimed identification more slowly; it does not reach it at all because the condition the claimed method identifies is a property of the combination and is absent from every constituent value considered on its own.

22. Moreover, the claims of the ’264 Patent are not directed to data processing untethered from vehicle hardware. The specification describes the corresponding architecture: a plurality of sensors distributed about the vehicle, providing state information to a states module that converts physical sensor signals into digital form for use by a processor, and a processor coupled to a database of pre-identified unsafe state combinations that performs the claimed comparison against real-time sensor and command data. *See id.*, 2:35-53 (describing various sensors, including speed sensors, and explaining that “The sensors are coupled to a states module 120 that is integrated with a processor 125”). Claims 3 and 25, for example, expressly recite such sensors. The claims are also confined to a particular implementation: they require that combinations of internal vehicle state values, including both sensed conditions and pending or executing commands, be compared against a stored dataset of pre-identified unsafe combinations.

23. The improvement claimed in the ’264 Patent is an improvement to the operation of the vehicle fault-detection system itself. The claimed system does not arrange the same sensor data differently. It computes a result—the identification of an unsafe combination of vehicle states—that prior single-variable systems did not and could not compute, because that identification exists only at the level of the combination and has no counterpart in any individually evaluated sensor reading.

24. The combinations recited in the ’264 Patent claims were not well-understood, routine, or conventional as of March 14, 2002. Vehicle fault-detection systems of that era evaluated sensor data one variable, or one sensor, at a time, and could not identify a fault reflected only in a particular combination of readings across multiple sensors and commands, none of which was individually anomalous. Plaintiff is aware of no system, and no publication, predating that date that compared combinations of internal vehicle state values, including combinations of sensed conditions and operator commands, against a stored database of known unsafe combinations, in the manner the claims require.

25. The ’264 Patent claims new and improved vehicle fault-detection systems that address problems rooted in and arising from the inability of conventional, single-variable fault-detection systems to identify failure conditions revealed only by combinations of vehicle states.

26. USPTO Patent Examiner Hung T. Nguyen examined the application that issued as the ’264 Patent, which was filed on March 14, 2002. The technology disclosed and claimed in the ’264 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Nguyen never rejected the ’264 Patent claims as directed to patent-ineligible material at any time during the examination period. On February 21, 2006, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 7,286,062**

27. On October 23, 2007, U.S. Patent No. 7,286,062 (“the ’062 Patent”), entitled “Perspective View Conformal Traffic Targets Display,” was duly and legally issued by the USPTO. A true and accurate copy of the ’062 Patent is attached hereto as Exhibit B.

28. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’062 Patent, including the sole and exclusive right to prosecute this action and enforce the ’062 Patent against infringers, and to collect damages for all relevant times.

29. Independent claim 1 of the ’062 Patent recites a display system comprising “a display screen for graphical display of data, one or more sensors for obtaining traffic data regarding traffic targets, one or more processors for receiving traffic data from the one or

more sensors, and for providing input to the display screen, and the display screen displaying traffic targets as icons in a 3-dimensional graphical representation of real space, wherein the display size of the icons is selected from a finite set of sizes which correspond to a finite set of distance ranges based on the distance to the traffic targets, the set of distance ranges comprises one range, and the set of sizes comprises continuous size variations corresponding to distances within the one range, the size variations being bounded by a maximum and a minimum icon size." '062 Patent, claim 1.

30. As of June 29, 2005, systems that displayed traffic targets in a three-dimensional graphical representation rendered target icons either at a uniform size irrespective of range, or at a size that varied as an unbounded function of range. Neither approach constrained the rendered output. A uniform-size rendering encoded no range information in icon size at all. An unbounded proportional mapping drove icon size toward zero as target range increased and toward the full extent of the display as range decreased, so that at either extreme of the system's operating envelope the rendered size of an icon no longer corresponded to a resolvable range value. *See id.*, 2:57-3:53.

31. The '062 Patent addresses that deficiency by selecting each icon's displayed size from a continuously varying range that is itself bounded by a defined maximum and minimum. *Id.*, claim 1. The claimed system thereby encodes each target's sensed range in the rendered size of its icon, while constraining the rendered output so that the icon for a near target cannot exceed a defined maximum extent and the icon for a far target cannot fall below a defined minimum extent.

32. Claim 1's requirement that the size variation be bounded by a maximum and a minimum is not an incidental display preference; it is the specific mechanism by which the claimed system resolves the tradeoff that a purely proportional, unbounded scaling approach could not resolve. The claim specifies the rule by which a computed quantity—each target's sensed range—is mapped to a rendered display parameter: a continuous mapping across a single defined distance range, bounded at both ends. The claimed system does not relocate

or reformat sensor data already available to it. It computes a display parameter that did not previously exist and applies that parameter to the rendered output.

33. The claims of the ’062 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires “a display screen for graphical display of data,” “one or more sensors for obtaining traffic data regarding traffic targets,” and “one or more processors for receiving traffic data from the one or more sensors, and for providing input to the display screen.” *Id.*, claim 1. The specification describes the corresponding architecture: a processor coupled to the display screen and to one or more sensors, configured to calculate each target’s distance and to select and update the corresponding icon size within the claimed bounded range as that distance changes. *See id.*, 6:16-40 (“Traffic sensors 602 include any number of receivers, infrared lasers, millimeter wave cameras or other sensor elements for obtaining traffic data regarding traffic targets. In some embodiments, traffic data includes data about a target’s location, speed, size, and trajectory.” “Processor 604 analyzes the data received from traffic sensors 602 and determines if the traffic targets are located within the field of view.” “Processor 604 also calculates the display icon size of targets.”).

34. The improvement claimed in the ’062 Patent is an improvement to the operation of the display system itself. The claimed system does not arrange the same sensor data differently. It computes a bounded, distance-correlated icon size—a display parameter that prior systems did not compute in this manner—and applies that computed size to the displayed representation of each detected target, constraining the rendered icon size to remain within the defined maximum and minimum at every range within the recited distance range.

35. The bounded mapping recited in claim 1 also improves the operation of the display system’s processor. Because icon size is selected from a range bounded at both ends rather than recomputed as an unbounded conformal projection for every target at every refresh, the claimed mapping reduces the computational cost of the icon-sizing operation itself. The specification identifies this as an advantage of the claimed approach, stating that

the claimed layered conformal view “reduces the load placed on the processor” in determining icon size and allows the processor to “work more efficiently on other tasks.” ’062 Patent, 3:49–53. The claimed advance is therefore an improvement to the functioning of the display system itself, and not the invocation of a computer as a tool for presenting information.

36. The combinations recited in the ’062 Patent claims were not well-understood, routine, or conventional as of June 29, 2005. Systems that displayed traffic targets in a three-dimensional graphical representation of that era either rendered all targets at a uniform size or scaled icon size as an unbounded function of range, and did not constrain the rendered icon size within a defined maximum and minimum across a single distance range. Plaintiff is aware of no system, and no publication, predating that date that displayed traffic targets at a variable size within a single defined distance range and bounded by a defined maximum and minimum icon size, in the manner the claims require.

37. The ’062 Patent claims new and improved traffic display systems that address problems rooted in and arising from the inability of conventional rendering approaches to encode sensed target range within a bounded display envelope, and from the processing load that unbounded conformal scaling imposed on the display system’s processor.

38. USPTO Patent Examiner Anne Viet Nga Lai examined the application that issued as the ’062 Patent, which was filed on June 29, 2005. The technology disclosed and claimed in the ’062 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Lai never rejected the ’062 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 3, 2007, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 7,840,352**

39. On November 23, 2010, U.S. Patent No. 7,840,352 (“the ’352 Patent”), entitled “Method and System for Autonomous Vehicle Navigation,” was duly and legally issued by the USPTO. A true and accurate copy of the ’352 Patent is attached hereto as Exhibit C.

40. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’352 Patent, including the sole and exclusive right to prosecute this action and enforce the ’352 Patent against infringers, and to collect damages for all relevant times.

41. Independent claim 1 of the ’352 Patent recites “providing one or more Global Positioning System (GPS) sensors, one or more inertial sensors, and one or more image sensors on an autonomous vehicle; obtaining one or more GPS measurements, one or more inertial measurements, and one or more image measurements from the respective GPS sensors, inertial sensors, and image sensors during operation of the autonomous vehicle; integrating together each of the GPS measurements, inertial measurements, and image measurements; and estimating a position of the autonomous vehicle over time based on the integration.” ’352 Patent, claim 1. Independent claim 13 recites a corresponding system, and independent claim 20 recites a corresponding computer-readable medium, each reciting “performing a deep integration” of the GPS, inertial, and image measurements and “estimating a position of the autonomous vehicle over time based on the deep integration.” The specification defines the integration the claims require by reference to specific raw sensor outputs: pseudoranges from the GPS sensors, angular velocities from gyroscopes or linear accelerations from accelerometers from the inertial sensors, and angles to objects observed in images from the image sensors. ’352 Patent, 3:1-8. Claims 5, 6, and 7 recite those same measurement types expressly. *Id.*, claims 13, 20.

42. As of September 5, 2006, autonomous vehicle position estimation using GPS, inertial, or image measurements individually was understood to be limited: GPS-based estimates could be disrupted by insufficient satellite visibility, inertial-measurement-based estimates accumulated error over time, and image-based estimates likewise accumulated error, including gross errors from image-matching failures. Some prior approaches combined estimates from only two of these three measurement types, or independently estimated position from each measurement type and subsequently merged the resulting independent estimates using an ad hoc method such as averaging. *See id.*, 1:6-45.

43. The ’352 Patent addresses those limitations through integration, including “deep integration”—finding a single position estimate that is consistent with the raw measurements from all three sensor types, rather than independently estimating position from each type and merging the results afterward. Because the estimate is calculated by jointly processing the raw measurements—rather than by combining three separate estimates from GPS, inertial, and image data—the claimed method can still produce an accurate result even when each individual estimate contains errors and cannot be reliably merged. The specification explains that independent estimation and merging cannot consistently achieve the level of reliability offered through the technology the ’352 Patent provides. *See id.*, 2:26-3:14.

44. Claims 1, 13, and 20 require integrated processing of raw measurements from a specifically defined set of three sensor types, not the collection of position-related data from each sensor followed by display or combination of independently-derived results. The claimed integration is the specific mechanism by which the method achieves a position estimate not obtainable by combining the outputs of three sensors processed independently of one another.

45. The claims of the ’352 Patent are not implemented on generic sensors performing generic functions. Claim 1 requires “one or more Global Positioning System (GPS) sensors, one or more inertial sensors, and one or more image sensors on an autonomous vehicle.” *Id.*, claim 1. Claim 13 requires a corresponding system, including each of these three specific sensor types coupled to a processor configured to perform the recited integration. *Id.*, claim 13. The specification describes the corresponding architecture: a processor coupled to the GPS sensor(s), the inertial sensor(s), and the image sensor(s), configured to jointly integrate the measurements obtained from all three into a single position estimate. The claimed advance does not reside in the computing hardware. It resides in the requirement that measurements from three specified and distinct sensor modalities be integrated with one another at the measurement level. Claim 1 requires integrating together the GPS, inertial and image measurements themselves, and estimating position “based on

the integration" of those measurements—not the merger of three position estimates derived independently from them. *See id.* at FIG. 1.

46. The improvement claimed in the '352 Patent is an improvement to the operation of the vehicle navigation system itself. The claimed system does not arrange the same sensor data differently. It computes a position estimate that prior systems did not and could not compute through independent estimation and merging, because the estimate is derived from the joint integration of measurements from all three sensor types rather than from a combination of three independently derived results.

47. The combinations recited in the '352 Patent claims were not well-understood, routine, or conventional as of September 5, 2006. Autonomous vehicle position-estimation systems of that era obtained GPS, inertial, or image measurements and in some cases combined estimates from two of the three measurement types, but did not jointly integrate measurements from all three types into a single position estimate. Plaintiff is aware of no system, and no publication, predating that date that jointly integrated raw measurements from all three types into a single position estimate, in the manner the claims require.

48. The '352 Patent claims new and improved autonomous vehicle navigation systems that address problems rooted in, and arising from, the accumulation of error inherent in position estimates derived independently from GPS, inertial, or image measurements alone.

49. USPTO Patent Examiner Yonel Beaulieu examined the application that issued as the '352 Patent, which was filed on September 5, 2006. The technology disclosed and claimed in the '352 Patent was not well understood, routine, or conventional at the time of the invention. The claims were examined and allowed over the prior art of record. On June 25, 2010, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 8,314,816**

50. On November 20, 2012, U.S. Patent No. 8,314,816 ("the '816 Patent"), entitled "System and Method for Displaying Information on a Display Element," was duly and

legally issued by the USPTO. A true and accurate copy of the ’816 Patent is attached hereto as Exhibit D.

51. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’816 Patent, including the sole and exclusive right to prosecute this action and enforce the ’816 Patent against infringers, and to collect damages for all relevant times.

52. Independent claim 1 of the ’816 Patent recites a method comprising “obtaining first range data for an object located in a sensing region at a first sampling time; obtaining image data corresponding to an image of the object at the sampling time; detecting low visibility conditions associated with the sensing region; acquiring second range data for the object at a second sampling time that occurs after the first sampling time; processing the image data and the second range data to generate image graphics content for a predicted image that corresponds to a simulated view of the object at the second sampling time; and rendering the image graphics content on the display element.” ’816 Patent, claim 1. Independent claim 14 recites a corresponding display system, including an onboard display element, an onboard ranging system, an onboard imaging system, at least one processor, and a graphics system, each cooperatively configured to perform corresponding operations. *Id.*, claim 14.

53. The ’816 Patent states that “although the display system 100 is described herein in an aviation context, the display system 100 may be located onboard and/or associated with other vehicles, such as ground-based vehicles or maritime vessels.” *Id.* at 4:40-43. Consistent with that disclosure, claim 1 is not limited to any vehicle, and claim 14 is directed to a vehicle of any type.

54. As of June 8, 2009, sensor-fusion display systems combined range data (e.g., from radar) with image data (e.g., from a camera) to render a correlated view of a sensed object. Real-time imaging systems had difficulty capturing accurate, detailed, and meaningful images under low-visibility conditions, and displays that depended on real-time image data for the image-related component of that correlated view were accordingly limited in their ability to render an accurate, current view of a sensed object once visibility degraded.

*See id.*, 11:20-31. Conventional ranging systems, such as radar, could operate well in low-visibility conditions, but the graphical information they produced was visually noisy or low resolution and often failed to accurately represent an object's size, shape, or other visually distinguishable features, rendering objects in a graphically ambiguous manner. A ranging system alone yielded a likely location for an object, but not data from which the object's type or configuration could be rendered. Moreover, where a ranging sensor's sampling rate was too low relative to the speed of a moving object, the object could appear to jump, blur, or be rendered at an exaggerated size on the display. Range data therefore did not provide a technical substitute for image data once real-time imaging became unreliable. A range-only rendering did not reproduce an object's size, shape, or visually distinguishable features, and so could not supply the image-related component of the correlated view that such display systems were built to render. *See id.*, 1:60-2:14.

55. The '816 Patent addresses that deficiency by detecting low visibility conditions and, upon detection, generating a predicted image of the sensed object from previously obtained (buffered) image data combined with newly-acquired range data, rather than continuing to rely on the imaging system's current, potentially unreliable output. *Id.*, claims 1, 14. The predicted image is generated to correspond to a simulated view of the object as it would appear at the later sampling time, compensating for movement of the object, the vehicle, or both, that occurred between the two sampling times. *See id.*, 11:13-42.

56. Claim 1, for example, requires this specific sequence, not merely the display of correlated range and image data generally: obtaining range and image data at a first time, detecting low visibility, and only then acquiring updated range data and generating a predicted image from the combination of the buffered image data and that updated range data. The claimed method does not simply combine the most recently available range and image data; it substitutes a specifically derived predicted image for real-time image data once a specific triggering condition—detected low visibility—has occurred. Claim 1 therefore recites a specific rule rather than a desired outcome stated at a level of generality that would cover any means of achieving it. The claim specifies what triggers the

substitution (detected low visibility conditions associated with the sensing region), which inputs the substitute image must be generated from (the image data obtained at the first sampling time together with the range data acquired at the second), and what the generated image must correspond to (a simulated view of the object at the second sampling time). *Id.*, claim 1.

57. The claims of the ’816 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires that data be obtained by various sensors, and expressly recites a “sensing region” for which data is obtained. Claim 14 requires “an onboard display element,” “an onboard ranging system,” “an onboard imaging system,” “at least one processor,” and “a graphics system,” each cooperatively configured to perform the recited operations. *Id.*, claim 14. The ’816 Patent describes the corresponding architecture including specific sensors to be used depending on the particular implementation. *See id.*, 5:38-63 (“the imaging system 106 may include a video camera, a still camera, an infrared camera or imaging device, a millimeter wave imager, a charge-coupled device (CCD)”), 6:23–48 (“the ranging system 108 may include a radar system (e.g., millimeter wave radar or x-band radar), a lidar system, an acoustic ranging system, an ultrasonic ranging system”). Claims 2–6 and 15, for example, further recite such sensors.

58. The improvement claimed in the ’816 Patent is an improvement to the operation of the display system itself. The claimed system does not simply display whatever image data is currently available. It generates a predicted image from buffered data specifically when real-time image data becomes unreliable, and renders that predicted image spatially and temporally correlated with updated range data—a display capability that prior systems, dependent on real-time image data alone, did not have. *Id.*, claims 1, 14.

59. The combinations recited in the ’816 Patent claims were not well-understood, routine, or conventional as of June 8, 2009. Sensor-fusion display systems of that era rendered a correlated display of range and image data obtained substantially concurrently, and depended on the continued reliability of real-time image data to do so. Plaintiff is aware of no system, and no publication, predating that date that detected low visibility conditions

and, in response, generated a predicted image from previously obtained image data combined with updated range data for display, in the manner the claims require.

60. The ’816 Patent claims new and improved display systems for a vehicle that address problems rooted in and arising from the dependence of prior sensor-fusion displays on real-time image data that becomes unreliable under degraded visibility conditions.

61. USPTO Patent Examiner Ryan R. Yang examined the application that issued as the ’816 Patent, which was filed on June 8, 2009. The technology disclosed and claimed in the ’816 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Yang never rejected the ’816 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 17, 2012, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 8,364,334**

62. On January 29, 2013, U.S. Patent No. 8,364,334 (“the ’334 Patent”), entitled “System and Method for Navigating an Autonomous Vehicle Using Laser Detection and Ranging,” was duly and legally issued by the USPTO. A true and accurate copy of the ’334 Patent is attached hereto as Exhibit E.

63. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’334 Patent, including the sole and exclusive right to prosecute this action and enforce the ’334 Patent against infringers, and to collect damages for all relevant times.

64. Independent claim 1 of the ’334 Patent recites a system comprising “at least one laser scanner configured to perform one or more range and intensity scans of an area around the autonomous vehicle; a geo-location unit for the autonomous vehicle, the geo-location unit comprising one or more global positioning system sensors, and one or more inertial navigation system sensors; and at least one processor in operative communication with the laser scanner and the geo-location unit, the processor configured to execute one or more program modules comprising: a ground plane-based processing module configured to receive range scan data transformed into world coordinates, and output ground plane-based classification data; a range-based processing module configured to receive data from a single

range scan, and output range-based classification data; an intensity-based processing module configured to receive intensity scan data, and output intensity-based classification data; and a classification fusion module configured to receive the classification data from each of the processing modules, and output range bin classification data." '334 Patent, claim 1. Independent claim 13 recites a corresponding method. *Id.*, claim 13.

65. As of October 30, 2008, autonomous ground vehicle navigation systems using laser range scanning classified detected range data using either a single scan in isolation or a history of prior scans, but did so through a single classification approach applied to the range data as a whole. *See id.*, 1:46–2:6. Such systems did not separately classify the same scan data along multiple independent dimensions—the accumulated history of the road surface, the geometry of a single scan, and the reflectance intensity of the scanned surface—and then combine the results of those separate classifications into a single output.

66. The '334 Patent addresses that architecture by processing the same range and intensity scan data through three independently configured processing modules: a ground plane-based module that classifies range bins using an accumulated history of prior scans, a range-based module that classifies range bins using only the current, single scan, and an intensity-based module that classifies range bins using the reflectance intensity of the scanned surface. A classification fusion module then receives the classification output of each of the three modules and generates a final range bin classification from the combination.

67. Claim 1 requires this specific multi-module architecture, not the classification of laser scan data generally. It requires that a ground plane-based module, a range-based module, and an intensity-based module each independently output classification data, and that a separate classification fusion module receive and combine the output of each of the three. *Id.*, claim 1. This ordered combination allows the system to identify road elements, curbs, and obstacles with a reliability that no single classification approach, standing alone, can achieve. The claims do not preempt laser-based classification of a vehicle's surroundings. A system that classifies scan data through a single approach, or through any

arrangement other than three separately recited classification modules feeding a distinct classification fusion module, falls outside claim 1.

68. The claims of the ’334 Patent are not implemented on generic sensors performing generic functions. Claim 1, for example, requires “at least one laser scanner,” “a geo-location unit . . . comprising one or more global positioning system sensors, and one or more inertial navigation system sensors,” and “at least one processor . . . configured to execute” the four specifically recited program modules, each of which the claim defines by the specific input it receives and the specific output it produces: the ground plane-based module receives range scan data transformed into world coordinates and outputs ground plane-based classification data; the range-based module receives data from a single-range scan and outputs range-based classification data; the intensity-based module receives intensity scan data and outputs intensity-based classification data; and the classification fusion module receives the classification data from each of the other three and outputs range bin classification data. The architecture, and the flow of data through it, are recited in the claim itself rather than left to the implementer. *Id.*, claim 1.

69. The improvement claimed in the ’334 Patent is an improvement to the operation of the vehicle navigation system itself. The claimed system does not classify the same range and intensity data using a single classification approach. It independently derives classification data along three separate dimensions from the same underlying scan data, and combines the three independently derived classifications into a single result.

70. The combinations recited in the ’334 Patent claims were not well-understood, routine, or conventional as of October 30, 2008. Autonomous ground vehicle navigation systems of that era classified laser range scan data using a single classification approach applied to the scan data as a whole. Plaintiff is aware of no system, and no publication, predating that date that separately derived classification data from a ground plane-based module, a range-based module, and an intensity-based module, and combined that classification data through a classification fusion module.

71. The ’334 Patent claims new and improved autonomous vehicle navigation systems that address problems rooted in and arising from the reliance of prior laser-based navigation systems on a single form of range scan classification.

72. USPTO Patent Examiner Truc M. Do examined the application that issued as the ’334 Patent, which was filed on October 30, 2008. The technology disclosed and claimed in the ’334 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Do never rejected the ’334 Patent claims as directed to patent-ineligible material at any time during the examination period. On November 9, 2012, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 9,355,567**

73. On May 31, 2016, U.S. Patent No. 9,355,567 (“the ’567 Patent”), entitled “System and Method for Highlighting an Area Encompassing an Aircraft That Is Free of Hazards,” was duly and legally issued by the USPTO. A true and accurate copy of the ’567 Patent is attached hereto as Exhibit F.

74. Honeywell Aerospace owns all substantial rights, interest, and title in and to the ’567 Patent, including the sole and exclusive right to prosecute this action and enforce the ’567 Patent against infringers, and to collect damages for all relevant times.

75. Independent claim 1 of the ’567 Patent recites: A method for indicating a hazard free area around a vehicle on a moving map, the vehicle comprising a type, comprising: displaying an icon representing the vehicle on the moving map; displaying a swath icon on the moving map, the swath icon depicting a zone around the icon representing the vehicle, the swath icon representing an object free area around the vehicle; detecting, based on a signal provided by a sensor on the vehicle, an object moving in the vicinity of the vehicle; displaying the detected object on the moving map; recognizing a maneuver the vehicle may take to avoid a collision with the detected object, based on the detected object, the moving map, and the vehicle type; displaying a second icon indicating the maneuver; and modifying the swath icon to contract based on a position of the detected object within a first threshold distance of the vehicle. ’567 Patent, claim 1.

76. The ’567 Patent states that although the described embodiments are specific to aircraft display systems, “principles of the inventive subject matter may be applied to other vehicle display systems.” *Id.*, 4:26-29. Consistent with that disclosure, claim 1 is directed to a vehicle of any type and recites the vehicle type as an operative input to the claimed method.

77. As of August 8, 2013, moving-map display systems for vehicles operating in proximity to obstacles rendered the positions of detected objects as discrete symbology superimposed on a map of the operating surface. *See id.*, 1:21-29. Those systems rendered where objects were located. They did not render the extent of the region around the vehicle that remained clear of detected objects, because they did not compute it. That region was not data in the moving-map database, was not an output of the object-detection sensors, and was not represented by any display element in those systems.

78. The ’567 Patent addresses that deficiency by introducing a display element of a different kind and specifying the rules that govern its geometry and its behavior. The swath icon recited in claim 1 does not depict a detected object, a surface feature, or any other datum present in the underlying moving-map data. It depicts a computed region—the zone around the vehicle that is free of detected objects. *Id.*, claim 1. The geometry of that region is computed rather than retrieved: the specification describes the swath icon as drawn based on the position of detected obstacles, and describes its width as determined in part by the width of the surface the vehicle occupies. *Id.*, 7:22-25.

79. Claim 1 requires that the swath icon be “modif[ied] . . . to contract based on a position of the detected object within a first threshold distance of the vehicle.” *Id.*, claim 1. The recited display element is therefore not fixed. Its depicted extent is a function of sensed object position. *See id.*, 7:34-37 (“If the obstacle 208 is close to the wingtip, the swath icon 202 in the corresponding side 222 will move closer to the aircraft 204”). The contraction is itself an output of the claimed method: the reduction of the rendered object-free zone occurs in the same spatial frame and the same coordinate system as the icon representing the vehicle and the icon representing the detected object, rather than in a separate indicator requiring independent interpretation.

80. Claim 1 further requires "recognizing a maneuver the vehicle may take to avoid a collision with the detected object, based on the detected object, the moving map, and the vehicle type," and requires "displaying a second icon indicating the maneuver." *Id.*, claim 1. Claim 1 does not recite collision avoidance as an objective while leaving the manner of achieving it unspecified. It requires that the maneuver be recognized from three enumerated inputs and that a second icon indicating the recognized maneuver be displayed. The specification describes that determination in the same terms, explaining that the system recognizes available routes based on detected obstacle information, the moving map database, and vehicle type, and displays an indication of the resulting maneuver. *Id.*, 7:5–60 ("the system recognizes exit routes based on adjacent obstacles information, the airport moving map database, and aircraft type and provides an arrow 426"); *see also id.*, 8:12–20 ("the system recognizes exit routes based on adjacent obstacles information, the airport moving map database, and aircraft type and provides an arrow 726"). The requirement that vehicle type be an input reflects a physical constraint: the maneuvering envelope of a vehicle—its width, its turning radius, its stopping distance—determines which avoidance maneuvers are geometrically available to it, and a maneuver recognized without reference to that envelope may be one the vehicle cannot execute.

81. The claims of the '567 Patent are not implemented on generic display hardware performing generic functions. Claim 1 requires that the object be detected "based on a signal provided by a sensor on the vehicle," and requires that the detected object be a moving object. *Id.*, claim 1. Claim 14 requires a display, a sensor on the vehicle configured to sense a moving object, a synthetic vision system configured to provide the moving map, and a processor coupled to each of the three and configured to perform the recited operations. *Id.*, claim 14. The specification describes the corresponding architecture, including a dedicated object-detection sensor and a processor communicatively coupled to that sensor, to the synthetic vision system, and to the display unit. *Id.*, FIG. 1, 5:33-38 ("The ground status sensor 18 senses hazards such as objects near the aircraft and includes, for example, a

radar”); *id.*, 6:10-12 (“Processor 24 is communicatively coupled to the EVS 12, GPS/avionics sensors 14, the SVS 16, and the ground status sensor 18”).

82. The improvement claimed in the ’567 Patent is an improvement to the operation of the vehicle display system itself. The claimed system does not arrange the same data differently. It computes a quantity that prior systems did not compute—the boundary of the object-free region—renders that quantity as a defined display element, and contacts that element as detected objects move relative to the vehicle. *Id.*, claim 1.

83. The combinations recited in the ’567 Patent claims were not well-understood, routine, or conventional as of August 8, 2013. Moving-map and proximity systems of that era detected objects, displayed their positions, and in some cases issued a warning when a detected object came within a threshold distance. Plaintiff is aware of no system, and no publication, predating August 8, 2013 that (i) rendered a computed object-free zone as a display element distinct from the elements representing detected objects and surface features, (ii) contracted that element based on the position of a detected moving object within a threshold distance of the vehicle, and (iii) recognized an available avoidance maneuver from the detected object, the moving map, and the vehicle type, and displayed a second icon indicating that maneuver, in the manner the claims require.

84. The ’567 Patent claims new and improved hazard-display systems for a vehicle that address problems rooted in and arising from the inability of conventional moving-map systems to compute or render the extent of the region around a vehicle that is free of detected objects, or to deform that rendered region as detected objects move relative to the vehicle.

85. USPTO Patent Examiner Ana D. Thomas examined the application that issued as the ’567 Patent, which was filed on August 8, 2013. The technology disclosed and claimed in the ’567 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Thomas never rejected the ’567 Patent claims as directed to patent-ineligible material at any time during the examination period. On March 14, 2016, the USPTO issued a Notice of Allowance for all pending claims.

**U.S. Patent No. 10,133,856**

86. On November 20, 2018, U.S. Patent No. 10,133,856 ("the '856 Patent"), entitled "Method and System for Managing Software License for Vehicle," was duly and legally issued by the USPTO. A true and accurate copy of the '856 Patent is attached hereto as Exhibit G.

87. Honeywell Aerospace owns all substantial rights, interest, and title in and to the '856 Patent, including the sole and exclusive right to prosecute this action and enforce the '856 Patent against infringers, and to collect damages for all relevant times.

88. Independent claim 1 of the '856 Patent recites a method comprising "receiving, by a processor, license term data of the license, the license term data including an expiration time limit of the license; observing, by a sensor, a condition of the vehicle; determining, by the processor, an operating state of the vehicle based on the condition observed by the sensor; and determining, by the processor, whether to deny access to the software module according to the expiration time limit based on the determined operating state." '856 Patent, claim 1. Independent claim 10 recites a corresponding system, including a processor and a sensor cooperatively configured to perform corresponding operations. *Id.*, claim 10.

89. The '856 Patent states that although the described embodiments are specific to aircraft systems, "it will be appreciated that the system 100 may be configured for software management for other types of vehicles (e.g., helicopters, cars, trucks, motorcycles, etc.) without departing from the scope of the present disclosure." *Id.*, 4:67-5:4. Consistent with that disclosure, claims 1 and 10 are directed to a vehicle of any type.

90. As of November 7, 2016, systems that managed the expiration of a software license enforced that expiration according to a fixed time limit, without regard to whether the licensed software was actively being relied upon for the operation of the vehicle at the moment the time limit was reached. Such systems had no mechanism for determining the vehicle's operating state and using that determination to decide when to enforce a license's expiration. That architecture presented a technical problem. A license term that elapsed while the vehicle was in operation would withdraw access to a software module at a moment

fixed by a clock, without regard to whether that module was then being relied upon in the operation of the vehicle.

91. The ’856 Patent addresses that deficiency by observing a condition of the vehicle via a sensor, determining the vehicle’s operating state from that observed condition, and determining whether to deny access to a licensed software module according to the license’s expiration time limit based specifically on that determined operating state—allowing enforcement of the expiration to depend on whether the vehicle is currently in a state in which denying access would be appropriate.

92. Claim 1 requires this specific conditional structure, not merely the tracking of a license expiration date generally. It requires observing a vehicle condition via a sensor, determining an operating state from that observation, and conditioning the decision whether to deny access to the software module on the determined operating state—a decision structure in which the same expiration time limit can result in different access outcomes depending on the vehicle’s operating state at the relevant time.

93. The claims of the ’856 Patent are not directed to the administration of licensing rights in the abstract. Claim 1 conditions the access determination on a physical measurement: a sensor must observe a condition of the vehicle, and the vehicle’s operating state must be determined from that observed condition before any determination whether to deny access is made. Claim 1 requires that license term data be received by a processor, that a condition of the vehicle be observed by a sensor, and that the processor determine an operating state of the vehicle and whether to deny access to a software module. Claim 10 requires “a processor configured to receive license term data of the license,” “a sensor configured to observe a condition of the vehicle,” and the same processor further configured to determine the vehicle’s operating state from the sensor’s observation and to determine whether to deny access based on the expiration time limit and that determined operating state. *Id.*, claim 10. *See also id.*, FIG 2 (depicting a processor and specific types of sensors). The claimed method accordingly cannot be performed by a system that measures a license term against a clock or a calendar, however that system is implemented. It requires sensing

a physical condition of the vehicle and deriving the vehicle's operating state from that sensed condition.

94. The improvement claimed in the '856 Patent is an improvement to the operation of the vehicle's software licensing system itself. The claimed system does not simply deny access once a stored expiration date is reached. It determines the vehicle's current operating state from sensor data and uses that determination, together with the expiration time limit, to decide whether denying access is appropriate at that time—a licensing decision that depends on real-time vehicle operating state, which fixed-expiration licensing systems did not perform. *Id.*, claims 1, 10.

95. The combinations recited in the '856 Patent claims were not well-understood, routine, or conventional as of November 7, 2016. Software license management systems of that era enforced license expiration according to a fixed time limit, without regard to the operating state of the vehicle on which the licensed software was running. Plaintiff is aware of no system, and no publication, predating that date that observed a vehicle's condition via a sensor, determined the vehicle's operating state from that observation, and determined whether to deny access to a licensed software module according to an expiration time limit based on that determined operating state, in the manner the claims require.

96. The '856 Patent claims new and improved systems and methods for managing software licenses for a vehicle that address problems rooted in and arising from the inability of fixed-expiration licensing systems to account for whether licensed software is actively relied upon for vehicle operation at the time of expiration.

97. USPTO Patent Examiner Robert T. Nguyen examined the application that issued as the '856 Patent, which was filed on November 7, 2016. The technology disclosed and claimed in the '856 Patent was not well understood, routine, or conventional at the time of the invention. Examiner Nguyen never rejected the '856 Patent claims as directed to patent-ineligible material at any time during the examination period. On July 25, 2018, the USPTO issued a Notice of Allowance for all pending claims.

## RIVIAN'S INFRINGING PRODUCTS

98. Rivian is an automotive technology company that develops and manufactures electric vehicles, as well as vertically integrated technologies and services, including its electrical architecture, end-to-end software, autonomous driving platform, artificial intelligence, and propulsion.[3]

99. Rivian launched its consumer vehicle business with the R1 platform consisting of two vehicles: the R1T, a two-row, five-passenger pickup truck, and the R1S, a three-row, seven-passenger sport utility vehicle.[4] The R1S and R1T vehicles are shown below[5]:







100. The R1T and R1S are equipped with technology including a zonal network architecture, electric powertrains and chassis, the Rivian Autonomy Platform, and digital user experience management via Connect+ including Rivian Assistant. According to

[3] Form 10-K, Rivian Automotive, Inc., Annual report for year ending December 31, 2025, p. 4 (February 12, 2026).

[4] *Id.*

[5] https://rivian.com/ (accessed Sept. 14, 2026).

Rivian's marketing, these technologies can continuously improve and expand functionality through cloud-enabled over-the-air updates.[6]

101. R2 is Rivian's new-for-2026 midsize SUV including the vertically integrated technologies developed for R1 such as Rivian's software stack, propulsion technology, the Rivian Autonomy Platform, and electrical architecture.[7] The R2 vehicle is shown below[8]:




102. All Rivian vehicles built through model year 2024 are considered Gen 1. All Rivian vehicles model year 2025 and onward are considered Gen 2.[9]

103. Driving Assist and Active Safety Assist features are standard on every Rivian vehicle. Driver+ is the assisted driving feature set associated with Gen 1 vehicles (model year 2022-2024). Driving Assist features include Highway Assist, Adaptive Cruise Control, and Lane Change Assist. Active Safety Assist features include Lane Keep Assist, Lane Departure Warning, Blind Spot Warning, Automatic High Beams, Rear Cross-Traffic

[6] Form 10-K, Rivian Automotive, Inc., Annual report for year ending December 31, 2025, p. 4 (February 12, 2026).

[7] *Id.*

[8] https://rivian.com/ (accessed Sept. 14, 2026).

[9] https://rivian.com/support/article/what-s-the-difference-between-gen-1-and-gen-2-vehicles (accessed Sept. 14, 2026).

Warning, Park Assist, Trailer Assist, Forward Collision Warning, Automatic Emergency Braking, and Dynamic Brake Support.[10]

104. Driver+ is the suite of assisted driving features that comes standard with Rivian's Gen 1 (model year 2022–2024) vehicles.[11] The Driver+ hardware system included 10 exterior cameras to help with day-to-day and higher-speed driving, 12 ultrasonic sensors providing 360° close-range coverage, and 4 corner radars and 1 forward radar to enable more complex maneuvers and monitoring, like lane changes and rear-cross traffic.[12]

105. With 10 HDR cameras and 5 radars, Rivian vehicles can perceive objects and vehicles up to 1,000 feet away.[13]




106. All new Rivian vehicles come standard with the Rivian Autonomy Platform, a suite of hardware, cameras, sensors, cloud connectivity, and assisted driving and safety features. Standard features include Highway Assist, Adaptive Cruise Control, Drive Styles, Co-Steer, Lane Departure Warning, Lane Keep Assist, Park Assist, Blind Spot Warning,

---

[10] https://rivian.com/support/article/what-features-are-included-in-rivian-driver (accessed Sept. 14, 2026).

[11] https://rivian.com/support/article/what-s-the-difference-between-driver-and-the-rivian-autonomy-platform (accessed Sept. 14, 2026).

[12] https://rivian.com/support/article/what-hardware-is-included-in-rivian-driver (accessed Sept. 14, 2026).

[13] https://rivian.com/autonomy (accessed Sept. 14, 2026).

Automatic High Beams, Rear Cross-Traffic Warning, Forward Collision Warning, Automatic Emergency Braking, and Dynamic Brake Support.[14]

107. Rivian Autonomy Platform is the suite of hardware, cameras, sensors and assisted driving features on Rivian's Gen 2 (model year 2025 and onward) vehicles.[15] Every Gen 2 Rivian vehicle includes Rivian's complete Rivian Autonomy Platform hardware system and redundant onboard computers including 11 high-resolution exterior cameras to help with day-to-day and higher-speed driving, and can see up to 10 seconds ahead at highway speeds, 12 ultrasonic sensors to provide 360° close-range coverage, 4 corner radars and 1 forward radar to enable more complex maneuvers and monitoring, like lane changes and rear-cross traffic, and a driver-facing camera integrated into the rearview mirror to detect driver fatigue and distraction.[16]

108. Autonomy+ is an upgrade that is available on Rivian's latest vehicles and features an even broader set of enhanced capabilities including Universal Hands Free and Lane Change on Command.[17] Universal Hands Free enables hands-free assisted driving on 3.5 million miles of roads in the US and Canada.[18] A Universal Hands-Free icon appears near the speedometer when driving on roads with clearly marked lanes. Rivian instructs customers to pull the drive stalk towards them twice to activate and drive hands-free.[19] Lane Change on Command assists in finding gaps in traffic and changing lanes.[20] Rivian instructs customers to turn on the blinker with Universal Hands-Free engaged and let the vehicle take

---

[14] https://rivian.com/support/article/what-is-the-rivian-autonomy-platform (accessed Sept. 14, 2026).

[15] https://rivian.com/support/article/what-s-the-difference-between-driver-and-the-rivian-autonomy-platform (accessed Sept. 14, 2026).

[16] https://rivian.com/support/article/what-hardware-is-included-in-the-rivian-autonomy-platform (accessed Sept. 14, 2026).

[17] https://rivian.com/support/article/what-is-the-rivian-autonomy-platform (accessed Sept. 14, 2026).

[18] *Id.*

[19] *Id.*

[20] *Id.*

it from there.[21] In December 2025, Rivian released its Universal Hands Free feature via an over-the-air update to its R1 Gen 2 customers.[22]

109. Rivian's Autonomy+ is depicted below[23]:




110. Rivian's Universal Hands-Free is depicted below[24]:




---

[21] *Id.*

[22] Form 10-K, Rivian Automotive, Inc., Annual report for year ending December 31, 2025, p. 4 (February 12, 2026).

[23] https://rivian.com/autonomy (accessed Sept. 14, 2026).

[24] https://rivian.com/autonomy (accessed Sept. 14, 2026).

111. New R1S and R1T deliveries include a 60-day trial of Autonomy+. Customers may subscribe for $49.99 per month or purchase for $2,500. [25]

112. Rivian uses GPS location for Rivian Navigation.[26]

113. Rivian safety system components include chassis stability control sensors.[27]

**RIVIAN'S KNOWLEDGE OF HONEYWELL AEROSPACE'S PATENTS AND OF RIVIAN'S INFRINGEMENT**

114. On April 20, 2023, counsel for Honeywell Aerospace sent a detailed written notice to Rivian. The April 2023 Letter identified numerous patents by number and title, enclosed a copy of each, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringed those patents.

115. Detailed claim charts were provided regarding several of the Patents-in-Suit, including the '062 Patent and the '264 Patent. These claim charts mapped the language of exemplary claims to specific functionality in specific Rivian products, and supported that mapping with citations to Rivian's own published materials, including Rivian's support articles and Rivian's product and technology pages, together with publicly available demonstrations of the accused features in operation.

116. The April 2023 Letter further enclosed a list of additional Honeywell Aerospace patents identified as relevant to, and as reading on, Rivian's products. That list included the remaining Patents-in-Suit, including the '816 Patent, the '567 Patent, the '856 Patent, the '334 Patent, and the '352 Patent.

[25] Form 10-K, Rivian Automotive, Inc., Annual report for year ending December 31, 2025, p. 5 (February 12, 2026); https://rivian.com/autonomy (accessed September 14, 2026).

[26] https://rivian.com/support/article/how-does-rivian-protect-the-privacy-of-my-navigation-data (accessed September 14, 2026).

[27] R1T Owner's Guide, Model Year 2022-2024, p. 76, https://assets.ctfassets.net/2md5qhoeajym/530xs9hu11xOKefT2JrvA5/ecb8500ae1654548a29d7e3ee918bf8b/r1t-my22-24-og-en-us-2026310.pdf (accessed September 14, 2026); R1T Owner's Guide, Model Year 2025-2027, p. 84, https://assets.ctfassets.net/2md5qhoeajym/58YFddVW81sybQaJvra4HF/07ef61333fd92e8e0325445697b53abd/r1t-my25-27-og-en-us-2026310.pdf (accessed September 14, 2026).

117. The April 2023 Letter asked for a substantive response from Rivian by May 4, 2023.

118. On June 2, 2023, Rivian responded by email, stating that it was reviewing the letter and that Rivian would respond. But Rivian never provided any further response to the patent infringement allegations.

119. On September 25, 2025, Honeywell Aerospace again reached out to Rivian. The September 2025 Letter enclosed the April 2023 Letter, restated that Rivian's vehicles infringed the four patents identified in 2023, and reminded Rivian that it never responded after June 2, 2023.

120. The September 2025 Letter also enclosed an additional claim chart mapping the claims of the '567 patent to the driver-assistance functionality in Rivian's R1T and R1S vehicles, including the vehicle's display of an icon representing the region ahead in which the vehicle can maneuver and the modification of that icon as objects are detected near the vehicle. The letter asked Rivian to make contact within two weeks to discuss a resolution.

121. Rivian did not respond to the September 2025 Letter.

122. Rivian has therefore had actual knowledge of all Patents-in-Suit no later than April 2023, and that Rivian's products infringe such patents. Rivian has never provided any substantive response to Honeywell Aerospace's communications, much less provided any reason why it does not infringe. Instead, Rivian continued to make, use, sell, offer for sale, and import components and vehicles that practice the Patents-in-Suit. Rivian also developed and released new products and features that practice the Patents-in-Suit.

**COUNT I:**

**INFRINGEMENT OF THE '264 PATENT**

123. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

124. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the '264 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for

sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’264 patent. These products include at least Rivian’s Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

125. As set forth in detail in Exhibit H, the Accused Instrumentalities infringe at least claim 1 of the ’264 patent.

126. Rivian practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Rivian uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of one or more of Driver+, Autonomy Platform, and Autonomy+ features.[28]

127. In view of the foregoing, Rivian has infringed and continues to infringe the ’264 patent in violation of 35 U.S.C. § 271.

128. Rivian has had knowledge of the ’264 patent and that its activities infringe the ’264 patent before the filing of this action.

129. Rivian has had actual knowledge that its activities infringe the ’264 patent since at least April 20, 2023, when Honeywell Aerospace served on Rivian a copy of the ’264 patent and a claim chart mapping the limitations of claim 1 of the ’264 patent to functionality in Rivian’s R1T and R1S vehicles.

130. Rivian has had actual knowledge that its activities infringe the ’264 patent since at least September 25, 2025, when Honeywell Aerospace served on Rivian a copy of the same April 20, 2023 claim chart mapping the limitations of claim 1 of the ’264 patent to identified functionality in Rivian’s R1T and R1S vehicles.

131. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of claim 1 of the ’264 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’264

[28] https://www.youtube.com/watch?v=XHS6jG2FlKY&list=PLfIUVdCK0GVI&index=4; https://rivian.com/stories/r2-realworld-testing-begins

patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

132. Despite its notice of the ’264 patent, Rivian takes active steps to knowingly induce infringement of the ’264 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features. Furthermore, in December 2025, Rivian delivered software release 2025.46 to its Gen 2 vehicles by over-the-air update, said software release 2025.46 contains features that further infringe at least claim 1 of the ’264 patent.[29]

133. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’264 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’264 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

134. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’264 patent by Rivian, together with interest and costs.

[29] https://rivian.com/stories/software-update-2025-46 (Last visited Sept. 11, 2026).

135. Despite having actual notice of the ’264 patent, Rivian has and continues to willfully infringe the ’264 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

**COUNT II:**

**INFRINGEMENT OF THE ‘062 PATENT**

136. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

137. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the ’062 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’062 patent. These products include at least Rivian’s Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

138. As set forth in detail in Exhibit I, the Accused Instrumentalities infringe at least claim 1 of the ’062 patent.

139. In view of the foregoing, Rivian has infringed and continues to infringe the ’062 patent in violation of 35 U.S.C. § 271.

140. Rivian has had knowledge of the ’062 patent and that its activities infringe the ’062 patent before the filing of this action.

141. Rivian has had actual knowledge that its activities infringe the ’062 patent since at least April 20, 2023, when Honeywell Aerospace served on Rivian a copy of the ’062 patent and a claim chart mapping the limitations of claim 1 of the ’062 patent to functionality in Rivian’s R1T and R1S vehicles.

142. Rivian has had actual knowledge that its activities infringe the ’062 patent since at least September 25, 2025, when Honeywell Aerospace served on Rivian a copy of the same April 20, 2023 claim chart mapping the limitations of claim 1 of the ’062 patent to identified functionality in Rivian’s R1T and R1S vehicles.

143. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of claim 1 of the ’062 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’062 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

144. Despite its notice of the ’062 patent, Rivian takes active steps to knowingly induce infringement of the ’062 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features. Furthermore, in December 2025, Rivian delivered software release 2025.46 to its Gen 2 vehicles by over-the-air update, said software release 2025.46 contains features that further infringe at least claim 1 of the ’062 patent.[30]

145. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’062 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’062 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

146. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for

[30] https://rivian.com/stories/software-update-2025-46 (Last visited Sept. 11, 2026).

the use made of the invention described in the ’062 patent by Rivian, together with interest and costs.

147. Despite having actual notice of the ’062 patent, Rivian has and continues to willfully infringe the ’062 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

**COUNT III:**

**INFRINGEMENT OF THE ‘352 PATENT**

148. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

149. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the ’352 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’352 patent. These products include at least Rivian’s Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

150. As set forth in detail in Exhibit J, the Accused Instrumentalities infringe at least claim 1 of the ’352 patent.

151. In view of the foregoing, Rivian has infringed and continues to infringe the ’352 patent in violation of 35 U.S.C. § 271.

152. Rivian has had knowledge of the ’352 patent and that its activities infringe the ’352 patent before the filing of this action.

153. Rivian has had actual knowledge of the ’352 patent since at least April 20, 2023, when Honeywell Aerospace identified the ’352 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

154. Rivian also has had actual knowledge of the ’352 patent since at least September 25, 2025, when Honeywell Aerospace identified the ’352 patent to Rivian by

number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace's patents.

155. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of the '352 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the '352 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

156. Despite its notice of the '352 patent, Rivian takes active steps to knowingly induce infringement of the '352 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

157. In addition, Rivian has indirectly infringed and continues to indirectly infringe the '352 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the '352 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

158. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian's direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the '352 patent by Rivian, together with interest and costs.

159. Despite having actual notice of the ’352 patent, Rivian has and continues to willfully infringe the ’352 patent in disregard of Honeywell Aerospace’s rights, making this case exceptional and entitling Honeywell Aerospace to reasonable attorney’s fees pursuant to 35 U.S.C. § 285.

**COUNT IV:**

**INFRINGEMENT OF THE ‘816 PATENT**

160. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

161. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the ’816 patent, including but not limited to claim 14, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’816 patent. These products include at least Rivian’s Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

162. As set forth in detail in Exhibit K, the Accused Instrumentalities infringe at least claim 14 of the ’816 patent.

163. In view of the foregoing, Rivian has infringed and continues to infringe the ’816 patent in violation of 35 U.S.C. § 271.

164. Rivian has had knowledge of the ’816 patent and that its activities infringe the ’816 patent before the filing of this action.

165. Rivian has had actual knowledge of the ’816 patent since at least April 20, 2023, when Honeywell Aerospace identified the ’816 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

166. Rivian also has had actual knowledge of the ’816 patent since at least September 25, 2025, when Honeywell Aerospace identified the ’816 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

167. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of the ’816 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’816 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

168. Despite its notice of the ’816 patent, Rivian takes active steps to knowingly induce infringement of the ’816 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

169. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’816 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’816 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

170. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’816 patent by Rivian, together with interest and costs.

171. Despite having actual notice of the ’816 patent, Rivian has and continues to willfully infringe the ’816 patent in disregard of Honeywell Aerospace’s rights, making this

case exceptional and entitling Honeywell Aerospace to reasonable attorney's fees pursuant to 35 U.S.C. § 285.

**COUNT V:**

**INFRINGEMENT OF THE '334 PATENT**

172. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

173. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the '334 patent, including but not limited to claim 13, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '334 patent. These products include at least Rivian's Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

174. As set forth in detail in Exhibit L, the Accused Instrumentalities infringe at least claim 13 of the '334 patent.

175. In view of the foregoing, Rivian has infringed and continues to infringe the '334 patent in violation of 35 U.S.C. § 271.

176. Rivian has had knowledge of the '334 patent and that its activities infringe the '334 patent before the filing of this action.

177. Rivian has had actual knowledge of the '334 patent since at least April 20, 2023, when Honeywell Aerospace identified the '334 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace's patents.

178. Rivian also has had actual knowledge of the '334 patent since at least September 25, 2025, when Honeywell Aerospace identified the '334 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace's patents.

179. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of the '334 patent that it contends is absent from the Accused

Instrumentalities, and has never asserted any basis on which it contends the ’334 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

180. Despite its notice of the ’334 patent, Rivian takes active steps to knowingly induce infringement of the ’334 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

181. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’334 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’334 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

182. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’334 patent by Rivian, together with interest and costs.

183. Despite having actual notice of the ’334 patent, Rivian has and continues to willfully infringe the ’334 patent in disregard of Honeywell Aerospace’s rights, making this case exceptional and entitling Honeywell Aerospace to reasonable attorney’s fees pursuant to 35 U.S.C. § 285.

**COUNT VI:**

**INFRINGEMENT OF THE ’567 PATENT**

184. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

185. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the ’567 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’567 patent. These products include at least Rivian’s Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

186. As set forth in detail in Exhibit M, the Accused Instrumentalities infringe at least claim 1 of the ’567 patent.

187. In view of the foregoing, Rivian has infringed and continues to infringe the ’567 patent in violation of 35 U.S.C. § 271.

188. Rivian practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Rivian uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting, advertisement, demonstration, and validation process that would involve use of one or more of Driver+, Autonomy Platform, and Autonomy+ features.[31]

189. Rivian has had knowledge of the ’567 patent and that its activities infringe the ’567 patent before the filing of this action.

190. Rivian has had actual knowledge of the ’567 patent since at least April 20, 2023, when Honeywell Aerospace identified the ’567 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

---

[31] https://www.youtube.com/watch?v=XHS6jG2FlKY&list=PLfIUVdCK0GVI&index=4; https://rivian.com/stories/r2-realworld-testing-begins

191. Rivian has had actual knowledge that its activities infringe the ’567 patent since at least September 25, 2025, when Honeywell Aerospace served on Rivian a claim chart mapping the limitations of claim 1 of the ’567 patent to identified functionality in Rivian’s R1T and R1S vehicles.

192. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of claim 1 of the ’567 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’567 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

193. Despite its notice of the ’567 patent, Rivian takes active steps to knowingly induce infringement of the ’567 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features. Furthermore, in December 2025, Rivian delivered software release 2025.46 to its Gen 2 vehicles by over-the-air update, said software release 2025.46 contains features that further infringe at least claim 1 of the ’567 patent.[32]

194. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’567 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’567 patent and thus have

[32] https://rivian.com/stories/software-update-2025-46 (Last visited Sept. 11, 2026).

no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

195. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian's direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the '567 patent by Rivian, together with interest and costs.

196. Despite having actual notice of the '567 patent, Rivian has and continues to willfully infringe the '567 patent in disregard of Honeywell Aerospace's rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNT VII:**

**INFRINGEMENT OF THE '856 PATENT**

197. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

198. In violation of 35 U.S.C. § 271, Rivian has infringed and/or induced others to infringe one or more claims of the '856 patent, including but not limited to claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '856 patent. These products include at least Rivian's Gen 1 and Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features.

199. As set forth in detail in Exhibit N, the Accused Instrumentalities infringe at least claim 1 of the '856 patent.

200. In view of the foregoing, Rivian has infringed and continues to infringe the '856 patent in violation of 35 U.S.C. § 271.

201. Rivian practices each step of each asserted method claim, *e.g.*, through use of the Accused Instrumentalities or testing. For example, on information and belief, Rivian uses and/or tests the Accused Instrumentalities through a quality assurance, troubleshooting,

advertisement, demonstration, and validation process that would involve use of one or more of Driver+, Autonomy Platform, and Autonomy+ features.[33]

202. Rivian has had knowledge of the ’856 patent and that its activities infringe the ’856 patent before the filing of this action.

203. Rivian has had actual knowledge of the ’856 patent since at least April 20, 2023, when Honeywell Aerospace identified the ’856 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

204. Rivian also has had actual knowledge of the ’856 patent since at least September 25, 2025, when Honeywell Aerospace identified the ’856 patent to Rivian by number and title, and advised Rivian that Rivian was marketing, using, selling, and offering for sale in the United States vehicle products that infringe Honeywell Aerospace’s patents.

205. Rivian did not respond to the September 2025 Letter. Rivian has never identified any limitation of the ’856 patent that it contends is absent from the Accused Instrumentalities, and has never asserted any basis on which it contends the ’856 patent is invalid or not infringed. Rivian instead continued, and continues, to make, use, offer for sale, sell, and import the Accused Instrumentalities.

206. Despite its notice of the ’856 patent, Rivian takes active steps to knowingly induce infringement of the ’856 patent by directing, encouraging, promoting, and instructing others to make, use, offer for sale, sell, and/or import infringing products in the United States. For example, by continuing to use, make, and sell Gen 1 and/or Gen 2 vehicles operating one or more of Driver+, Autonomy Platform, and Autonomy+ features. Furthermore, in December 2025, Rivian delivered software release 2025.46 to its Gen 2 vehicles by over-the-air update, said software release 2025.46 contains features that further infringe at least claim 1 of the ’856 patent.

[33] https://www.youtube.com/watch?v=XHS6jG2FlKY&list=PLfIUVdCK0GVI&index=4; https://rivian.com/stories/r2-realworld-testing-begins.

207. In addition, Rivian has indirectly infringed and continues to indirectly infringe the ’856 patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, the Accused Instrumentalities, and advertising and/or performing updates and/or maintenance on the Accused Instrumentalities with knowledge that the Accused Instrumentalities and updates and/or maintenance thereto are especially designed or adapted to operate in a manner that infringes that patent and despite the fact that the infringing technology or aspects of the products are not a staple article of commerce suitable for substantial non-infringing use. The infringing aspects of the Accused Instrumentalities can be used only in a manner that infringes the ’856 patent and thus have no substantial non-infringing uses. The infringing aspects of those instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

208. Honeywell Aerospace is entitled to the relief provided by 35 U.S.C. § 284, including, *inter alia*, damages adequate to compensate Honeywell Aerospace for Rivian’s direct and indirect infringement, but not less than a reasonable royalty and/or lost profits for the use made of the invention described in the ’856 patent by Rivian, together with interest and costs.

209. Despite having actual notice of the ’856 patent, Rivian has and continues to willfully infringe the ’856 patent in disregard of Honeywell Aerospace’s rights, entitling Honeywell Aerospace to an award of enhanced damages pursuant to 35 U.S.C. § 284 and attorneys’ fees pursuant to 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Honeywell Aerospace hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Honeywell Aerospace respectfully requests that this Court:

a) Enter judgment in favor of Honeywell Aerospace and against Rivian;

b) Enter judgment that Rivian has willfully infringed one or more claims of each Patent-in-Suit;

c) Preliminarily and permanently enjoin Rivian and those in concert with it from further infringement of any claim of any Patent-in-Suit;

d) Award Honeywell Aerospace damages in an amount sufficient to compensate it for Rivian's infringement of one or more claims of each Patent-in-Suit, together with pre-judgment and post-judgment interest, costs, and all other damages permitted under 35 U.S.C. § 284;

e) Declare that this is an exceptional case within the meaning of 35 U.S.C. § 285;

f) Award Honeywell Aerospace its costs in this action, together with reasonable attorneys' fees and pre-judgment and post-judgment interest;

g) Perform an accounting of Rivian's infringing activities through trial and judgment;

h) Statutory damages, including multipliers and equitable enhancements, as permitted by law; and

i) Award Honeywell Aerospace such other and further relief, including other monetary and equitable relief, as this Court deems just and proper.

Respectfully submitted this 18th day of September 2026.

OSBORN MALEDON

By: s/ Theresa Rassas
Theresa Rassas
Joseph Roth
2929 North Central Ave., Suite 2000
Phoenix, AZ 85012

ARNOLD & PORTER KAYE SCHOLER LLP
Brent P. Ray (pro hac vice forthcoming)
811 Main St., Suite 1800
Houston, TX 77002
Tel: 312-583-2325
Email: Brent.Ray@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
Matthew M. Wolf (pro hac vice forthcoming)
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5462
Fax: 202-942-5999
Email: Matthew.Wolf@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
Patrick C. Reidy (pro hac vice forthcoming)
300 North LaSalle Drive, Suite 3500
Chicago, IL 60654
Tel: 312-583-2424
Fax: 312-583-2360
Email: Patrick.Reidy@arnoldporter.com

Attorneys for Plaintiff
Honeywell Aerospace US LLC